# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# ST. JOSEPH DIVISION

JOEL LEVINE,                          )
                                      )
            Plaintiff,                )
                                      )
      v.                              )        Case No. 06-6040-CV-NKL-P
                                      )
KATHY ROEBUCK, et al.,                )
                                      )
            Defendants.               )

## ORDER

Plaintiff Joel Franklyn LeVine, an inmate with the Missouri Department of Corrections, brings this 42 U.S.C. § 1983 action against Defendants Kathy Roebuck, Donald Greim and Tonya Youngs for injuries he sustained as a result of a catheterization performed during a drug test. Defendant Youngs, in her own motion [Doc. # 62], and Defendants Roebuck and Greim, in a combined motion [Doc. # 63], move for summary judgment as to LeVine's Fourth and Eighth Amendment claims. This Court now grants summary judgment in favor of all Defendants. This Court also denies LeVine's Motion to Strike Defendants Roebuck and Greim's Motion for Summary Judgment [Doc. # 72].

## I.     Factual Background

### A.     Plaintiff LeVine's Motion to Strike

Pending before the Court are two motions for summary judgment: one filed by Young and one filed jointly by Roebuck and Greim. LeVine submits a Combined Suggestions in

1

Opposition to both; however, he fails to respond to Roebuck and Greim's statement of facts, claiming:

> For the purposes of these suggestions, Plaintiff disputes each and every factual allegation of Defendants Greim and Roebuck provided in their Statement of Facts, as the statement of facts does not comply with Local Rule 56.1(a). It is not possible to adequately identify any specific statements Plaintiff disputes as the paragraphs are not numbered.

[Doc. # 73 at 6]. LeVine has also filed a separate Motion to Strike Roebuck and Greim's summary judgment motion [Doc. # 72]. It is true that Defendants Greim and Roebuck did not comply with Local Rule 56.1's requirement that "[e]ach fact shall be set forth in a separately numbered paragraph." Defendants Greim and Roebuck also tend to state their facts in paragraph form, but instead of providing a citation to the record for each sentence, they often rely on a single citation at the end of the paragraph.

Yet, despite these shortcomings, Defendants' failure to set forth each fact into a separately numbered paragraph does not rise to the level of preventing LeVine from being able to adequately identify specific statements. In fact, LeVine has responded to many of Defendants' factual allegations through his own Statement of Additional Facts, as well as in his responses to Youngs' statement of facts. Thus, the Court will not strike Roebuck and Greim's statement of facts because it would be too harsh a sanction. *See Nw. Bank & Trust Co. v. First. Ill. Nat'l Bank*, 354 F.3d 721, 725 (8th Cir. 2003) (district courts have discretion in application of local rules). The record is sufficiently clear and developed that the Court can determine which relevant facts are uncontroverted. Therefore, the Court denies LeVine's

Case 5:06-cv-06040-NKL   Document 77   Filed 10/16/07   Page 2 of 23

Motion to Strike.

### B. LeVine's Encounter with Youngs

On November 24, 2004, Tonya Youngs, a Correctional Officer I (C.O. I) with the Western Missouri Correctional Center (WMCC), ordered Joel LeVine–an inmate –to provide a urine sample for the Institutional Drug Testing Program for the purpose of detecting and deterring contraband drug use at the facility. At the time of the incident, LeVine was 68 years old. This testing was done as part of a random drug screening including approximately 100 inmates. Although Youngs did not tell LeVine that this test was being done under the Offender Substance Abuse Testing Policy, he was aware that Youngs "just wanted a urine test on me to see if I had any narcotics or alcohol in my system." LeVine was expected to provide the sample within two hours, but, although he attempted to comply with the order, he was unable to do so. Youngs threatened to issue a conduct violation if he did not comply, which would result in a loss of visitation privileges and place him in administrative segregation.

When LeVine still could not produce a sample, he informed Youngs that he had an enlarged prostate. Youngs then contacted the WMCC medical center and spoke to the hospital administrator, who confirmed LeVine had an enlarged prostate and told her to give him some more time. As a result, Youngs gave LeVine more water and an additional ten minutes, but he still could not produce a urine sample. Youngs then ordered LeVine to be taken to the medical unit to be catheterized. LeVine never told Youngs that he did not want to go to the medical unit for catheterization.

3

C.O. I Patrick Dunlap escorted LeVine to the medical unit, while Youngs remained in the visiting room. Youngs was not present at any time during the procedure, has no knowledge of any of the procedures conducted by the WMCC medical staff, and was unaware that LeVine faced any risk of harm. As a result of WMCC medical staff's attempts to catheterize LeVine, he was injured. He returned to the medical unit several times to complain of pain, and later was taken to a local hospital where he was successfully catheterized. The catheter had to remain in place for five days as a result of the injuries LeVine sustained at the prison infirmary.

LeVine ultimately provided a sample through catheterization; the results of the drug screen were negative. Since the catheter was removed, he has been able to urinate without problem and his injuries have healed. LeVine was not issued a conduct violation for his failure to provide a urine sample.

LeVine claims that Youngs failed to follow the proper procedures for offender substance abuse testing outlined in the Missouri Department of Corrections Institutional Services Policy. Prison policy states that "[a]ll offenders may at any time be required to submit a urine, saliva, hair or sweat specimen for drug testing . . . ." The policy contemplates urine samples will be provided in a cup, and there is no mention of catheterization. Further, the policy provides that when an unobserved sample must be taken, the prisoner is to wait in an area where a staff member can observe him until the prisoner is able to provide a sample, at which time the prisoner may go to the restroom with the staff person waiting immediately outside. Finally, the prison policy states that

4

staff supervising urine collection shall be the same gender as the prisoner, and that there shall be no physical contact between staff and the prisoner during specimen collection.

### C. LeVine's Encounter with Roebuck and Greim

Kathleen Roebuck, a registered nurse, was employed as a staff nurse in the WMCC Emergency Department. On November 24, 2004, at approximately 1:30 PM, LeVine arrived at the WMCC Emergency Department escorted by custody staff. LeVine informed Roebuck before she attempted to pass the catheter that he had an enlarged prostate gland. When Roebuck could not successfully pass the catheter, she called Donald Greim–also a registered nurse employed as a staff nurse in the WMCC Emergency Department–for assistance, who, after several attempts, also could not pass the catheter. LeVine asserts neither Greim nor Roebuck asked him if he consented to the procedure. During both procedures, LeVine claims he asked Greim and Roebuck to stop and that he was in pain.

Greim and Roebuck then called Dr. Martin, who instructed them to stop their attempts to catheterize. When the catheter was withdrawn, there was some blood at the tip consistent with mild injury to the prostatic urethra and creation of a "false passage" into the prostate. According to Roebuck, after the failed attempts to catheterize LeVine, she approached Dr. Milo Farnham for his suggestions. She states Dr. Farnham ordered that LeVine be provided with an antibiotic and a pain relieving medicine, then sent back to his cell. LeVine was returned to his cell after the failed catheterization. Several times that day, LeVine came back to the medical unit to complain of pain and his inability to

5

urinate, requesting medical attention. The first time he returned, Roebuck claims she told LeVine that the pain would subside soon since he had taken his medicine.

The next time LeVine returned, he continued complaining of abdominal pain and the inability to urinate. Roebuck claims she consulted with Dr. Farnham, who examined LeVine, determining that a "false passage" had likely been created by the catheterization attempts. At approximately 4:30 PM, Dr. Farnham ordered LeVine transferred to a local hospital to be evaluated by a urologist and have a catheter placed through the true passage. Upon arrival at the local hospital, LeVine was successfully catheterized and returned to WMCC with the catheter in place. While the catheter was in place, LeVine requested several times that it be removed because he was experiencing pain, but he was told that the medical staff at the prison would determine when it would be removed. According to his deposition testimony, LeVine explained he understood Dr. Farnham did not want the catheter removed right away because he did not want to have to do it again. Also in his deposition, LeVine "guessed" that the catheter was left in place for nine days, although Dr. Farnham and LeVine's Complete Medical Record History indicate the catheter was removed on November 29, 2004, five days after it was first inserted. In his deposition, LeVine stated he did not have any evidence that Roebuck and Greim were deliberately trying to hurt him; he just thought they did not know what they were doing.

According to Dr. Farnham's affidavit, catheterizing men with enlarged prostates can be complicated, due to the prostatic urethra being narrowed. As a result, the proper technique for passing the catheter through the narrowed prostatic urethra is to manipulate

6

the catheter in order to allow it to pass, including backing the catheter partially out, repositioning, and then attempting to pass it back through the urethra. Dr. Farnham explained this might require multiple attempts. In his experience, it frequently occurs in these situations that the catheter will penetrate through the prostatic urethra and into the prostate itself, resulting in a "false passage." This can cause a minor amount of bleeding. After reviewing LeVine's medical records, Dr. Farnham concluded that the technique used by Roebuck and Greim was correct and within accepted standards. Additionally, Dr. Farnham explained that the injury LeVine suffered is a known complication of catheterization and occurs with some frequency. Finally, Dr. Farnham noted that proper treatment of the injury is the application of antibiotic and analgesic treatments. If the patient is still unable to urinate, the proper treatment involves successful catheterization followed by leaving the catheter in place for several days to allow the urethra to heal.

LeVine claims that Greim and Roebuck failed to follow the proper procedures for offender substance abuse testing outlined in the Missouri Department of Corrections Institutional Services Policy. Among his several assertions, LeVine states the policy was violated when Roebuck, a woman, supervised the urine collection and came in physical contact with him. He also claims that the policy was violated because the correct person did not authorize the use of a catheter to collect a urine sample for a random drug test.

## II.    Summary Judgment Standard

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

7

show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party who moves for summary judgment bears the burden of showing that there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). When considering a motion for summary judgment, a court must scrutinize the evidence in the light most favorable to the nonmoving party and the nonmoving party "must be given the benefit of all reasonable inferences." *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir. 1991) (citation omitted).

To establish a genuine issue of fact sufficient to warrant trial, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 248. However, the nonmoving party "cannot create sham issues of fact in an effort to defeat summary judgment." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 402 (8th Cir. 1995) (citing *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361 (8th Cir. 1983)).

## III.    Discussion[1]

### A.    Fourth Amendment

---

[1]LeVine originally filed his complaint *pro se*, and it is somewhat unclear which legal theories he is asserting against which Defendants. For purposes of summary judgment, this Court will accept LeVine's claims as stated in his response to Defendants' motions for summary judgment.

Case 5:06-cv-06040-NKL   Document 77   Filed 10/16/07   Page 8 of 23

## 1. Constitutional Violation

LeVine first argues that Youngs, Roebuck and Greim violated his Fourth Amendment rights by requiring him to be catheterized for a random drug test, constituting an unreasonable search and seizure. "The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The Eighth Circuit has held that a urinalysis constitutes a search or seizure for purposes of the Fourth Amendment. *See United States v. Twiss*, 127 F.3d 771, 773 (8th Cir. 1997) ("A compelled urinalysis is a search under the Fourth Amendment . . . .") (citation omitted)). Thus, "the searches must be conducted in a reasonable manner." *Spence v. Farrier*, 807F.2d 753, 755 (8th Cir. 1986). The Supreme Court mandates that "[p]rison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979); *see also Spence*, 807 F.2d at 755. The test for determining reasonableness involves "[b]alancing the significant and legitimate security interests of the institution against the privacy interests of the inmates." *Spence*, 807 F.2d at 755 (citing *Bell*, 441 U.S. at 560).

As the Eighth Circuit recognized, prisons have a significant and legitimate interest in drug testing inmates because "[t]he unauthorized use of narcotics is a problem that plagues virtually every penal and detention center in the country." *Id.* Although it is

9

well-established that prisoners do not have a legitimate expectation of privacy in their prison cells and surroundings, s*ee Hudson v. Palmer*, 468 U.S. 517, 525-26 (1984), prisoners do have some reasonable expectations of privacy when it comes to their bodies. *See Sparks v. Stutler*, 71 F.3d 259, 261 (7th Cir. 1995) ("Certainly *Hudson* does not establish that the interior of one's body is as open to invasion as the interior of one's cell.").  As noted by the Ninth Circuit, "we consider the forceful use of the catheter to obtain a body fluid to be a gross personal indignity."  *Yanez v. Romero*, 619 F.2d 851, 855 (10th Cir. 1980); *see also Ellis v. City of San Diego*, 176 F.3d 1183, 1191 (9th Cir. 1999). This is true of all people, whether prisoners or not.  Still, "[b]ecause of the prison's security needs, the prisoner's expectation of privacy in his or her body is diminished. . . . The prisoners' limited expectation of privacy does not forbid random urine collection and analysis."  *Spence*, 807 F.2d at 755 (citation omitted).  The question is whether using a catheter to conduct a random drug test, without the prisoner's consent, is objectively reasonable.  *See Shade v. City of Farmington, Minn.*, 309 F.3d 1054, 1061 (8th Cir. 2002) (stating Fourth Amendment "permits a range of objectively reasonable conduct").

Here, under the circumstances, Youngs' actions were not objectively reasonable. The fact is LeVine was a 68-year-old man with a history of prostate problems.  Youngs did not suspect LeVine was using or under the influence of drugs; she was only administering a random drug test.  There is no evidence that LeVine was trying to avoid detection; to the contrary, he attempted to comply with her request.  When LeVine could not voluntarily urinate, Youngs was advised by medical staff to allow LeVine more time

10

due to his enlarged prostate; however, Youngs only gave LeVine an additional 10 minutes before ordering the catheterization. But, there is no evidence, and Youngs does not suggest, that time was of the essence. Because there were no exigent circumstances justifying an immediate need for LeVine's urine sample, there was a ready alternative to forced catheterization: Youngs could have placed LeVine in a room and waited until he urinated. *See, Turner v. Safley*, 482 U.S. 78, 90 (1987) ("[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation."). This alternative would fully accommodate LeVine's right not to be subjected to forced catheterization as part of a random drug test at *de minimis* cost to the WMCC's valid penological interests.

In *Spence v. Farrier*, the Eighth Circuit held that a prisoner's limited expectation of privacy does not forbid random drug testing. *See* 807 F.2d at 755. There, the court determined that the prison official's actions were reasonable because the drug testing was truly random. *See id.* "Under the circumstances, we are unable to say that the procedure used unnecessarily exposes prisoners to the risk of harassment or that the practice lends itself to abuse." *Id.* These same principles apply to the present case. Under the circumstances, forced catheterization for the purposes of a random drug test, where otherwise there is no reasonable suspicion, is a practice that lends itself to abuse. *Cf. Richmond*, 490 F.3d at 1008 ("Finally, the law was clear that strip searches should be performed in a hygienic fashion and not in a degrading, humiliating or abusive fashion."). Although the Court agrees that WMCC has a valid penological interest in using random testing to detect drug use among its prison population, in the present case those same

11

interests do not justify the forced catheterization of a 68-year-old-man whose only fault for not producing a timely sample is that he has an enlarged prostate. *See Hill v. McKinley*, 311 F.3d 899, 904 (8th Cir. 2002).

The Court holds that involuntary catheterization of a 68-year-old man with a history of prostate problems, as part of a random drug screening and without suspicion, is unreasonable. This invasive procedure is particularly unreasonable—as opposed to taking hair, blood, sweat or saliva samples—because, unlike those other collection methods, catheterization is a gross personal indignity to the prisoner. *See Yanez*, 619 F.2d at 855. Youngs could have chosen several other less intrusive options, including keeping LeVine in a room until he was able to urinate; Youngs was surely aware of these alternatives as they were outlined in the prison's own drug testing policy. As a result, prison officials like Youngs, when considering the use of invasive procedures, and before deciding which action to ultimately take, should look at the readily available alternatives and their respective levels of intrusiveness in determining the constitutionally acceptable range of reasonableness. *See Bell*, 441 U.S. at 559 (outlining test for reasonableness, stating "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted"); *cf. Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982) (in qualified immunity context, "[w]hen an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate"). Therefore, because Youngs did not conduct the search in a reasonable manner, she violated LeVine's Fourth

12

Amendment rights.

### 2. *Youngs and Qualified Immunity*

Even though Youngs violated LeVine's Fourth Amendment rights, she is still immune from suit if she is protected by qualified immunity. "Qualified immunity shields governmental officials from personal liability if their actions, even if unlawful, were 'nevertheless objectively reasonable in light of the clearly established law at the time of the events in question.'" *Turpin v. County of Rock*, 262 F.3d 779, 783 (8th Cir. 2001) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987)). Thus, "[a] state official . . . is protected by qualified immunity from a section 1983 claim 'unless [his] alleged conduct violated clearly established federal constitutional or statutory rights of which a reasonable person in [his] position [] would have known." *Mo. Protection & Advocacy Servs. v. Mo. Dep't of Mental Health*, 447 F.3d 1021, 1025 (8th Cir. 2006) (quoting *Wright v. Rolette County*, 417 F.3d 879, 884 (8th Cir. 2005)). A state official is protected by qualified immunity "so long as 'their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Wilson v. Lawrence County*, 260 F.3d 946, 951 (8th Cir. 2001) (quoting *Anderson*, 483 U.S. at 638).

In determining whether a legal right is clearly established, the Eighth Circuit "applies a flexible standard, requiring some, but not precise factual correspondence with precedent, and demanding that officials apply general, well-developed legal principles." *Whisman through Whisman v. Rinehart*, 119 F.3d 1303, 1309 (8th Cir. 1997). But, the lack of any decisions from the United States Supreme Court, the Eighth Circuit Court of

Appeals, the Western District of Missouri or the Missouri Supreme Court does not mean the law is not clearly established. *See Konop v. Nw. Sch. Dist.*, 1998 DSD 27, ¶ 11, 26 F. Supp. 2d 1189, 1194. The Eighth Circuit explains:

> While the identity of a court and its geographical proximity may be relevant in determining whether a reasonable official would be aware of the law (as might the dissemination of information within the pertinent profession and the frequency of similar litigation), we do not think that the defendants' per se rule adequately captures what the Supreme Court has meant by its objective test for what is clearly established.

*Id.* at ¶ 11, 1195 (quoting *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1049 (8th Cir. 1989)). In the absence of any precedence, "a court should look to all available decisional law including decisions of state courts, other circuit and district courts . . . ." *Id.* (quoting *Burnham v. Ianni*, 119 F.3d 668, 677 (8th Cir. 1997)). As noted by the *Konop* court, requiring factual identity between the current and prior cases would result in defendants receiving one "bite of the apple," which is contrary to the purpose of qualified immunity. *See id.* at ¶ 12, 1195. Instead, there must be "fair warning" of the constitutional right, and general principles of law can provide that warning. *See id.* (citing *United States v. Lanier*, 520 U.S. 259 (1997)); *see also J.H.H. v. O'Hara*, 878 F.2d 240, 243 (8th Cir. 1989) (explaining that under qualified immunity analysis, courts are to look to statutory and case precedent in addition to well-established principles of law, "and demanding that officials apply general, well-developed legal principles").

Despite Youngs' constitutional violation, this Court believes the law of the Eighth Circuit was not clearly established at the time of Youngs' actions; therefore, she is

14

protected by qualified immunity.  At the time Youngs ordered LeVine to the medical unit to receive a catheter, there was no statute or Eighth Circuit case law explicitly stating that using a catheter to conduct a random drug test in prison constitutes an unreasonable search.  In fact, much of the available case law at the time suggested it may be reasonable.  In *Spence v. Farrier*, the Eighth Circuit held that prison administrators did not violate the Fourth Amendment by subjecting prisoners to random drug testing using urinalysis.  *See* 807 F.2d at 755.  "The prisoners' limited expectation of privacy does not forbid random urine collection and analysis."  *Id.*  Involuntary catheterization for medical purposes, with officers assisting primarily to keep the peace, was found reasonable in *Tinius v. Carroll County Sheriff Dep't*, 321 F.Supp. 2d 1064, 1075-56 (N.D. Iowa 2004).  Other out-circuit cases indicate there are times when involuntary catheterization of prisoners is allowed, and none hold it cannot be performed as part of a random drug test.  *See United States v. Chukwubike*, 956 F.2d 209, 212 (9th Cir. 1992) (invasion of body for medical purposes is neither search nor seizure); *Saulsberry v. Maricopa County*, 151 F. Supp. 2d 1109, 1117 (D. Ariz. 2001) ("Because Plaintiff was catheterized solely for medical reasons, it does not constitute either a search or a seizure.").

Additionally, in another case with some, but not precise factual correspondence, the Eighth Circuit held that random visual body cavity searches in prison do not violate the Fourth Amendment.  *See Goff v. Nix*, 803 F.2d 358 (8th Cir. 1986) (random searches of prisoners moving from segregated confinement to general population or medical facilities); *see also Sparks*, 71 F.3d at 261 (analogizing use of catheter to body cavity

15

search). "While [visual body cavity] searches admittedly are intrusive and unpleasant, a prison inmate has a far lower expectation of privacy than do most other individuals in our society." *Goff*, 803 F.2d at 365. The Eighth Circuit explained that the prison officials' articulated reasons for the policy—specifically that the body cavity searches helped in discovering contraband—"clearly outweigh the minimal additional intrusion of the inmates' personal rights resulting from the [visual body cavity] searches." *Id*. As a result, the searches did not violate the Fourth Amendment. *See id*.

Moreover, in *Sparks v. Stutler*, a Seventh Circuit case, prison guards found a syringe in a prisoner's shoe and suspected him of drug use. *See* 71 F.3d at 260. When the prisoner did not produce the urine sample they requested, they took the prisoner to the infirmary where he was given an involuntary catheterization. *Id.* Although the Seventh Circuit explained that *Hudson* did not establish that a prisoner's body was subject to the same level of invasion as a prisoner's cell, it did compare the use of a catheter with a body cavity search. *Id*. at 261. "[Body cavity searches] have uniformly been held to be consistent with constitutional norms when conducted with prisons." *Id*. The court also analogized a catheter to a needle used to draw blood. *Id*. (citing *Winston v. Lee*, 470 U.S. 753 (1985)). However, "[a] catheter is more intrusive than a needle but less intrusive than a scalpel, making it hard to classify the procedure under an objective reasonableness inquiry." *Id*. Because it was difficult to determine whether the procedure was objectively reasonable, the Seventh Circuit held the "existence of such line-drawing problems calls for immunity." *Id*.

16

Here, Youngs, as a prison official, was clearly within the law in conducting a random drug test using urinalysis.  In light of the pre-existing law, and under general legal principles, it is not apparent that Youngs' actions involving LeVine's catheterization were unlawful.  *See Mo. Protection & Advocacy Servs.*, 447 F.3d at 1025 (citing *Anderson*, 483 U.S. at 640).  Given there is no Supreme Court or Eighth Circuit case law deciding the issue of whether a prison official may subject a prisoner to an involuntary catheterization as part of a random drug test, and specifically the fact that there is no case expressly forbidding it, this Court cannot say that Youngs' actions clearly violated a well-established right.  *Cf. McMorrow v. Little*, 109 F.3d 432, 435 (8th Cir. 1997) ("Because there is no applicable North Dakota precedent and a split in the decisions by other courts, we cannot conclude the law was well established and we hold that the constitutional right that McMorrow claims the officials violated was not clearly established.").  Therefore, the Court grants Youngs' summary judgment as to the Fourth Amendment claim based upon qualified immunity.  *See Sparks*, 71 F.3d at 262 ("Legal uncertainty surrounding the use of invasive medical procedures in prison entitles these defendants to immunity.").

    3.    *Defendants Roebuck and Greim and Qualified Immunity*

In their Suggestions in Support of Motion for Summary Judgment [Doc. # 64], Roebuck and Greim do not address any Fourth Amendment claims, instead focusing on the Eighth Amendment.  Presumably, this is because LeVine's *pro se* complaint [Doc. # 1] is somewhat unclear as to which claims he is bringing against which Defendants.  "Though pro se complaints are to be construed liberally . . . they still must allege

sufficient facts to support the claims advanced." *Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004). Exhibit (E) to LeVine's complaint states his factual allegations against Defendants Roebuck, Greim and Youngs, claiming "[t]his is a clear violation of my constitutional rights to privacy, protection from 'unreasonable search & seizure' and to be free from cruel & unusual punishments . . . ." [Doc. # 1]. Exhibit (E) lists in detail how Roebuck and Greim, as members of the WMCC medical staff, repeatedly attempted to administer the catheter for the purposes of a urine sample to be used in conjunction with a random drug test, and that he was injured by their efforts. Liberally construing LeVine's *pro se* complaint, he has alleged sufficient facts to support both Fourth and Eighth Amendment claims against Roebuck and Greim.

But, Roebuck and Greim were simply following a request from Youngs, which was a reasonable response on their part. *See J.H.H.*, 878 F.2d at 244 n.4 (noting official's actions are not immune just because they were taken according to orders; instead, immunity depends on whether a reasonable person in defendants' position should have known their conduct violated clearly established constitutional rights). It is unreasonable to expect medical personnel in Roebuck and Greim's place to independently evaluate LeVine's constitutional rights with the same level of knowledge as a prison official, and then decide, again independently, whether to obey the prison official's cathterization request. When Roebuck and Greim attempted to pass the catheter into LeVine, they were acting in their capacity as WMCC medical staff. At the time of the incident, there was no clearly established constitutional rights of which a reasonable person in Roebuck and

18

Greim's positions would have known. *See Mo. Protection & Advocacy Servs.*, 447 F.3d at 1025. Their actions as WMCC medical staff were objectively reasonable in light of the clearly established law at the time of the events in question. *See Turpin*, 262 F.3d at 783. As the Seventh Circuit explained, "But if doctors must reach their own conclusions about reasonableness [of searches], then the lack of clear substantive rules precludes an award of damages." *Sparks*, 71 F.3d at 261. Because a prisoner's right to not be subjected to involuntary catheterization for a random drug test has not been clearly established in the Eighth Circuit, this Court grants summary judgment in favor of Roebuck and Greim on the Fourth Amendment claim.

### B.   Eighth Amendment

#### 1.   *Defendant Youngs*

Although Youngs initially treated LeVine's Eighth Amendment claim as a conditions of confinement claim under *Farmer v. Brennan*, 511 U.S. 825 (1994), in his response LeVine asserts it is actually a brutality by prison employee claim [Doc. # 73 at 17]. *See Berryhill v. Schriro*, 137 F.3d 1073, 1076 (8th Cir. 1998). Therefore, this Court will apply the standard LeVine claims he is proceeding under. Under the Eighth Amendment, although the plaintiff "must allege and prove the unnecessary and wanton infliction of pain, the particular standard to be applied depends upon the kind of conduct of which the [plaintiff] complains." *Id*. The brutality by prison employee standard requires a determination of "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."

19

*Id.* (citing *Wilkins v. Moore*, 40 F.3d 954, 958 (8th Cir. 1994)).

In the present case, there is no evidence that Youngs acted maliciously and sadistically for the very purpose of causing LeVine harm. LeVine admitted in his deposition that he knew Youngs "wanted a urine test on me to see if I had any narcotics or alcohol in my system." Further, he admits that Youngs was never present while the medical staff attempted to pass the catheter. He also states that he understood that it was Dr. Farnham, not Youngs, who did not want the catheter removed right away. Nowhere in his complaint does LeVine state any facts or claims suggesting Youngs acted maliciously and sadistically for the very purpose of causing him harm. LeVine's only support for his allegations is that Youngs threatened him with a conduct violation if he did not produce a sample, and that does not controvert his admission that Youngs originally requested the sample for drug testing purposes, not to cause him harm.[2] This simply does not rise to the level of malicious or sadistic behavior required by the Eighth Amendment.

The facts, in the light most favorable to LeVine, do not show Youngs ordered the

_____

[2]In his opposition to summary judgment, LeVine also cites to an affidavit stating that he "was told by a nurse that the catheter was being left in me as punishment for my failure to provide a urine sample." [Doc. # 73, Ex. B ¶ 23]. This statement does not indicate whether it was Youngs administering the punishment. Further, in his statement of additional facts, LeVine provides no other support for this claim. To the extent this is an allegation against Defendants Youngs, Roebuck and Greim, combined with the allegation's vagueness, the Court will not consider this statement part of the record because LeVine cannot use an affidavit to create sham issues of fact in an effort to defeat summary judgment. *See RSBI Aerospace, Inc.*, 49 F.3d at 402. LeVine's deposition testimony indicates he thought the catheter "was kept in for punishment by Dr. Farnham." Dr. Farnham is not a party to this lawsuit, and, as noted above, there are no facts imputing this action to the Defendants.

20

catheterization in bad faith.  *See Spence*, 807 F.2d at 755.  No reasonable jury could find otherwise.  Therefore, the Court grants summary judgment to Youngs on the Eighth Amendment claim.

### 2.    *Defendants Roebuck and Greim*

Again, because of the vagueness of Levine's original complaint, for purposes of their summary judgment motion, Roebuck and Greim assumed the Eighth Amendment claim against them was for deliberate indifference to LeVine's serious medical needs [Doc. # 64 at 8].[3]  In his response, LeVine clarifies he is applying the same brutality by prison official standard as he does against Youngs [Doc. # 73 at 22 (citing *Berryhill*, 137 F.3d at 1076)].  But there is nothing in the record supporting that Roebuck and Greim used force maliciously and sadistically for the very purpose of causing LeVine harm.  *See Berryhill*, 137 F.3d at 1076.  Levine admits as such in his deposition testimony:

> Q.    Did you understand that they were merely trying to get the catheter in to allow you to pass urine?
>
> A.    Yeah, but I – I don't think they knew what they were doing.
>
> Q.    I understand that's your opinion.  Certainly you don't have any evidence that they were deliberately trying to injure you,

---

[3]LeVine, in his response to summary judgment, hardly addresses whether Roebuck and Greim were deliberately indifferent to his medical needs.  In fact, LeVine states: "Plaintiff has not pled that the medical staff were deliberately indifferent to a medical need and the Defendants' argument in that regard is misplaced." [Doc. # 73 at 22].  LeVine cannot point to any fact that supports Greim and Roebuck were deliberately indifferent to his constitutional rights, health or safety.  *See Berryhill*, 137 F.3d at 1076.  He simply says he does not think they knew what they were doing. Thus, even if LeVine pled the deliberate indifference standard, which he expressly claims he did not, his Eighth Amendment claim against Roebuck and Greim fails.

21

>                    correct?
>
> A.     No.
>
> Q.     No, not correct, or no, you don't have any evidence that they
>        were deliberately trying to injure you?
>
> A.     I don't have any evidence other than the fact they didn't know
>        what they were doing.

Negligence is not the standard for an Eighth Amendment claim. *See Wilson v. Seiter*, 501 U.S. 294, 305 (1991) ("To be sure, mere negligence would satisfy neither [the 'maliciously and sadistically' standard] nor the more lenient 'deliberate indifference' standard . . . ."); *cf. Newman v. Holmes*, 122 F.3d 650, 652 (8th Cir. 1997) (holding negligence is not enough to succeed on Eighth Amendment claim for failure to protect). Levine asserts no facts against Roebuck and Greim–other than they did not know what they were doing–to support that they acted maliciously and sadistically for the very purpose of causing him harm. To the contrary, he did not believe they were trying to injure him at all; he just thinks they were not qualified to do their job. Moreover, Dr. Farnham's affidavit suggests Roebuck and Greim used the correct procedure in attempting to catheterize LeVine, and that his resulting injuries were not infrequent in men with enlarged prostates. Defendants Roebuck and Greim acted in good faith as part of an effort to detect and deter drug use in the prison. Thus, the Court grants summary judgment in favor of Defendants Roebuck and Greim on the Eighth Amendment claim.

**C.     Section 1983 Liability for Violating Prison Policy**

Levine asserts that Defendants violated his Fourth and Eighth Amendment rights

by failing to follow several provisions of the Missouri Department of Corrections' policy regarding how drug tests are to be administered. "Section 1983 guards and vindicates federal rights alone." *Ebmeier v. Stump*, 70 F.3d 1012, 1013 (8th Cir. 1995). State prison policy, like state statutes, does not grant federal constitutional rights. *See Doe v. Gooden*, 214 F.3d 952, 955 (8th Cir. 2000) ("Violations of state law do not state a claim under 42 U.S.C. § 1983."). Thus, LeVine cannot rely on Defendants' failure to follow Missouri Department of Corrections' policy and procedure as a separate basis for his federal constitutional claims.

## IV.    Conclusion

Because Youngs, Roebuck and Greim are protected by qualified immunity, the Court grants their Motions for Summary Judgment.

Accordingly, it is hereby

ORDERED that Defendant Youngs' Motion for Summary Judgment [Doc. # 62] and Defendants Greim and Kathleen Roebuck's Motion for Summary Judgment [Doc. # 63] are GRANTED. It is further

ORDERED that Plaintiff LeVine's Motion to Strike [Doc. # 72] is DENIED.


                                            s/ Nanette K. Laughrey
                                            NANETTE K. LAUGHREY
                                            United States District Judge

Dated:  October 16, 2007
Jefferson City, Missouri

Case 5:06-cv-06040-NKL   Document 77   Filed 10/16/07   Page 23 of 23